AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>                    Plaintiff(s)<br>      v.<br><br>JOSHUA BARRERA<br>("BARRERA")<br><br>                    Defendant(s). | **LODGED**<br>CLERK, U.S. DISTRICT COURT<br>2/7/2023<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: VAV  DEPUTY<br><br>**FILED**<br>CLERK, U.S. DISTRICT COURT<br>February 7, 2023<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: MR  DEPUTY<br><br>Case No.   2:23-mj-00579-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of December 13, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Unlawful Possession of a Machine Gun |

This criminal complaint is based on these facts:

*Please see attached affidavit.*
☒ Continued on the attached sheet.

/s/
_____
Complainant's signature

James Yun, FBI Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: February 7, 2023

_____
Judge's signature

City and state: Los Angeles, California

Honorable Pedro V. Castillo, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT

I, James Yun, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for JOSHUA BARRERA ("BARRERA") for a violation of 18 U.S.C. § 922(o): Unlawful Possession of a Machinegun.

2. This affidavit is also made in support of a search warrant for 472 West Bennett Street, Compton, CA 90220 (the "SUBJECT PREMISES") further described in Attachment A, for the items to be seized described in Attachment B.

3. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## BACKGROUND OF SPECIAL AGENT JAMES YUN

4. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2016. During my tenure with the FBI, I have participated in numerous investigations of violent crime, drug trafficking organizations,

and large-scale street gangs, including criminal enterprise investigations.  Through these investigations, I have become familiar with the methods, language, structures, and criminal activities of street gangs and transnational gangs operating in and through this judicial district.  I have become familiar with the street and leadership level extortion and collection activities of these gangs.  I have become familiar with the types and amount of profit made by narcotics smugglers and methods, language, and terms that are used to disguise the source and nature of profits from their illegal drug and weapons dealing.

5.  Over the course of my career, I have personally interviewed numerous gang members and narcotics traffickers involved in the criminal enterprise investigations I have worked.  I have participated in the debriefing of cooperating defendants, witnesses, confidential human sources, and defendants who had personal knowledge regarding criminal street gang activity, major narcotics trafficking organizations, and other criminal offenses, including violent crimes.

## SUMMARY OF PROBABLE CAUSE

6.  On December 13, 2022, the Los Angeles County Sheriff's Department ("LASD") executed a state search warrant at the SUBJECT PREMISES, where they arrested BARRERA pursuant to a state arrest warrant.  During a subsequent search pursuant to a search warrant, detectives found a Springfield Compact Pistol, two magazines with 12 rounds of .45 caliber ammunition and a

full auto sear with a selector switch, which meets the definition of a "machinegun" under 26 U.S.C. § 5845(b).

### STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports and body camera footage, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

    A.    **BARRERA is Arrested and Admits to Possessing an Automatic Weapon**

8. On December 13, 2022, the SUBJECT PREMISES was searched and BARRERA was arrested at the SUBJECT PREMISES for operating an illegal marijuana dispensary in violation of California Health and Safety Code § 11366. The search of the SUBJECT PREMISES and BARRERA's arrest were pursuant to a search and arrest warrant, which had been authorized by the Honorable Stacy Wiese, State of California, County of Los Angeles (the "First State Warrants").

9. Following his arrest, BARERRA was placed in a recorded cell where a recording captured him admitting that, while law enforcement officers were attempting to execute the search warrant at the SUBJECT PREMISES, BARRERA threw a firearm and a "switch" out of his bedroom window.

    B.    **LASD Detective Obtains a Second Search Warrant for the SUBJECT PREMISES**

10. Based on BARRERA's statement in the recorded jail cell, later that day, on December 13, LASD Homicide Detective Francis X. Hardiman obtained a second search warrant for the SUBJECT PREMISES, which was issued by the Honorable Craig

Richman, State of California, County of Los Angeles (the "Second State Warrant").

### C. JOSHUA BARRERA Unlawfully Possessed a Machine Gun

11. While executing the Second State Warrant that same day, law enforcement officers recovered a Springfield Compact Pistol, two magazines with 12 rounds of .45 caliber ammunition, and a full auto sear with a selector switch (defined infra). All of these items were located along the exterior of the SUBJECT PREMISES, directly underneath the window of the room previously identified as BARRERA's bedroom.

12. I am a certified firearms expert with the FBI. I have been a special agent with the FBI since 2016 and have conducted numerous investigations involving firearms. I have examined numerous firearms and ammunition involved in various criminal investigations. On January 27, 2023, I personally examined the full auto sear with selector switch. An auto sear is a small device made of metal or plastic that can make any pistol a fully automatic weapon. Upon initial inspection of the auto sear seized in this case, there was a visible automatic sear pin hole located above the selector switch. I conducted a field test for fully automatic capability which yielded positive results.[1] Based on initial appearance and field test, I believe this

---

[1] A field test for fully automatic capability involves the following: with the magazine and all ammunition removed from a firearm, the bolt or slide is pulled to the rear to release. The tester will then pull the trigger and keep it depressed then pull the bolt or slide to the rear again. The trigger is then released and pulled again. If the firing mechanism (hammer) does not fall when the trigger is pulled for the second time, this is consistent with the firearm operating in the fully automatic mode.

switch is designed to alter the function of a semi-automatic firearm and render it a fully automatic machinegun and therefore regulated under Title 26 U.S.C. § 5845, the National Firearms Act ("NFA").  The switch therefore qualifies as a "machine gun" as defined by Titles 18, United States Code, Section 921(a)(24) and 28, United States Code, Section 5845(b), in that it is a part "designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."  As such, it is prohibited by Title 18, United States Code, Section 922(o).

    **D.**    **BARRERA Currently Resides at the SUBJECT PREMISES**

    13.  On December 13 – the same day BARRERA arrested – he was released from jail on bond.  BARRERA's California Driver's License, lists the SUBJECT PREMISES as his address.  Additionally,
On January 30, 2023, I conducted surveillance at the SUBJECT PREMISES and saw BARRERA leaving the SUBJECT PREMISES and departing in a vehicle bearing license plate 9BSR473.  That vehicle is registered to a Pedro Barrera at the SUBJECT PREMISES.

    **TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

    14.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

        a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as

5

items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that individuals who own illegal firearms (such as machine guns and auto sears) will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

      b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.    Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they

or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

       d.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

15. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

8

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BARRERA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BARRERA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

18. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## CONCLUSION

19. For all of the reasons described above, there is probable cause to believe that BARRERA has committed a violation of 18 U.S.C. § 922(o): Unlawful Possession of a Machine Gun. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 on this
_7th_ day of February, 2023.

_[signature]_

THE HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE